**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MILLENIUM AIRSHIP, INC.              )
                                     )
                   Plaintiff,        )
                                     )
        v.                           )     Case No.: 2023-CV-__16218_____
                                     )
TARPEY WIX, LLC,                     )
                                     )
                   Defendant.        )
                                     )

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C §§1332, 1441(b) and 1446, and with full reservation of all rights and defenses, Defendant Tarpey Wix, LLC ("Defendant") hereby gives notice of the removal of this case from the Circuit Court of Cook County, Illinois under case number 23L10391, to the United States District Court for the Northern District of Illinois, Eastern Division. In support of removal, Defendant provides the following short and plain statement for the grounds for removal pursuant to 28 U.S.C. §1446(a).

## BACKGROUND

1.      On October 12, 2023, Plaintiff Millenium Airship, Inc. ("Plaintiff") its complaint for legal malpractice against Defendant.

2.      Plaintiff alleges that Defendant committed legal malpractice in connection with Defendant's alleged representation of Plaintiff in an underlying lawsuit that the Superior Court of Los Angeles County, California ultimately dismissed as time-barred.

3.      In the underlying lawsuit, Plaintiff was pursuing, *inter alia*, Lockheed Martin, claiming that Lockheed Martin and other various underlying defendants had, *inter alia*, breached agreements with Plaintiff related to the development, marketing and sale of "hybrid airships,"

which allegedly are "blimp-like" air vessels that would have "the ability to transport massive cargo to hard-to-reach locations in an efficient and cost-effective means unparalleled by rival modes of freight logistics." (Compl. at ¶11).

4.      In the underlying lawsuit, Plaintiff alleged, *inter alia*, that they expended over One Million Dollars ($1 million) in "start up" capital in reliance on the underlying defendants' alleged assurances and promises related to the airship projects. (Compl. at ¶39).

5.      Indeed, the underlying lawsuit sought recovery of those $1 million start up costs, as well as other damages. (*Id*. at ¶39, ¶70).

6.      The instant Complaint alleges that Defendant negligently filed the underlying lawsuit after the underlying statutes of limitations passed, which resulted in the underlying lawsuit being dismissed and, thus, depriving Plaintiff the opportunity to recover from the underlying lawsuit.

7.      Accordingly, the instant legal malpractice case is seeking the amount that Plaintiff contends it would have recovered (including, *inter alia*, the $1 million in "start up" costs set forth above) in the underlying case.

8.      A copy of the instant complaint is attached as **Exhibit A.**

## <u>REMOVAL IS PROPER UNDER DIVERSITY JURISDICTION</u>

9.      This is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed to this Court by Defendant pursuant to the provisions of 28 U.S.C. § 1441(b), because this is an action between citizens of different states and the amount In controversy exceeds the sum of $75,000.

### *<u>Plaintiff and Defendant Are Diverse</u>*

10.     For diversity purposes, an individual is a citizen of her place of domicile. *See 24 Hour Fitness USA, Inc. v. Bally Total Fitness Holding Corp*., 2008 WL 4671748, at *9-11 (N.D. Ill. Oct. 21, 2008). It has long been established that natural persons are typically a citizen of the state in which they reside or — to be more precise —are "domiciled." *Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 634 (7th Cir. 2021) (citing *Gilbert v. Da*vid, 235 U.S. 561, 569 (1915); see also, § 3612 The Requirement and Meaning of Citizenship—Determination of a Person's Domicile, 13E Fed. Prac. & Proc. Juris. § 3612 (3d ed.).

11.     Plaintiff admits that it is a citizen of the State of Washington. (Ex. A at ¶9).

12.     Plaintiff alleges that Defendant is an LLC and a resident of Illinois. (Ex. A at ¶10).

13.     Defendant hereby confirms that it is an LLC with its principal place of business in Illinois.

14.     Defendant hereby confirms that no member of the LLC is a resident or domiciled in the state of Washington.

15.     Therefore, in light of the foregoing, complete diversity of citizenship exists as between the Plaintiff who is a Washington citizen, and Defendant who is a citizen of Illinois and who has no member that is a citizen of Washington.

             *Amount in Controversy Exceeds $75,000*

16.     The "removing defendant, as proponent of federal jurisdiction, must establish what the plaintiff stands to recover." *Meridian Sec. Ins. Co. v. Sadowski,* 441 F.3d 536, 541 (7th Cir. 2006). The Seventh Circuit Court of Appeals has "suggested several ways in which this may be done—by contentions interrogatories or admissions in state court; by calculation from the complaint's allegations; by reference to the plaintiff's informal estimates or settlement demands;

or by introducing evidence, in the form of affidavits from the defendant's employees or experts, about how much it would cost to satisfy the plaintiff's demands." *Id.* (internal citations omitted).

17.     In the Northern District of Illinois, Courts have held that the amount in controversy can be inferred from the Complaint. *Midland Mgmt. Co. v. Am. Alternative Ins. Corp.,* 132 F. Supp. 3d 1014, 1019 (N.D. Ill. 2015). In Midland, the Court concluded that although the Complaint listed the total damages as only $50,000, but that was done for procedural reasons and the description of the purported damages could easily exceed $75,000.

18.     Like in *Midland*, Plaintiff and its counsel affirm for procedural reasons that Plaintiff's claimed damages "exceed" $50,000. (Ex. A at p. 22).

19.     Further, the Complaint itself makes apparent that Plaintiff is seeking in excess of $75,000. For example, Plaintiff is seeking to recover, *inter alia*, the $1 million in "start up" costs that it sought in the underlying case and for which it claims it was deprived an opportunity to recover by way of Defendant's alleged negligent. (Ex. A at ¶39).

20.     Based on the foregoing, the amount in controversy exceeds $75,000 and pursuant to 28 U.S.C. §1441(a), the above captioned case may be removed to this Court.

        *Notice Timely Filed*

21.     The Complaint was filed October 12, 2023, and service on Defendant was effectuated on October 25, 2023. (*See*, Cook County Sheriff Record attached as **Exhibit B**).

22.     Thirty days from October 25, 2023, is November 24, 2023, the date on which this notice is being filed.

23.     Therefore, this notice as been timely removed as filed within 30 days of learning that this case is removable.

24. For the foregoing reasons, this Court has original jurisdiction over this matter under Section 1332(b) because complete diversity exists and the amount in controversy exceeds the jurisdictional limit of $75,000.

WHEREFORE, Defendant, Tarpey Wix, LLC, notifies that this cause has been removed from the Circuit Court of Cook County, Illinois to the United States District Court for the Northern District of Illinois, Eastern Division, and pursuant to the provisions of 28 USC §1446 and the Rules of the United States District Court for the Northern District of Illinois.

Dated: <u>November 24, 2023</u>　　　　　　　Respectfully Submitted,

Kimberly E. Blair　　　　　　　　　　　**Tarpey Wix, LLC**
Wilson Elser LLP
55 W. Monroe; Suite 3800　　　　　　　By: <u>/s/ Kimberly E. Blair</u>
Chicago, IL 60603　　　　　　　　　　One of its attorneys
(312) 821-6139
Kimberly.blair@wilsonelser.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 24, 2023, I electronically filed the aforesaid document with the Clerk of Court and via ECF and electronically served the foregoing and attached on all counsel of record as set forth below:

*Attorney for Plaintiff*

Jefferey Ogden Katz
The Katz Law Firm, P.C.
161 North Clark Street, Suite 1600
Chicago, Illinois 60601
jkatz@thekatzlaw.com

# EXHIBIT

# A

# PLAINTIFF'S COMPLAINT

290090350v.1

Case: 1:23-cv-16218 Document #: 1 Filed: 11/24/23 Page 8 of 31 PageID #:8

FILED
10/12/2023 12:22 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023L010391
Calendar, Y
24760161

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Millennium Airship, Inc.

      Plaintiff,

v.

Tarpey Wix LLC,

      Defendant.

No.  2023L010391

**JURY TRIAL DEMANDED**

## COMPLAINT

NOW COMES the Plaintiff, Millennium Airship, Inc., ("Plaintiff"), by and through its attorneys, The Katz Law Firm, P.C., and complains of Defendant Tarpey Wix LLC ("Defendant") as follows:

### Preliminary Statement

1.    This is an action for legal malpractice that arises out Defendant's acts, errors, omissions and deviations from the standard of care in representing Plaintiff with respect to an action filed in the State of California.

2.    Specifically, Plaintiff Millennium Airship ("Plaintiff" or "Millennium") retained Tarpey Wix LLC ("Defendant") to pursue an action involving: 1) Violation of the California Uniform Trade Secret Act; 2) Breach of Proprietary Information; 3) Breach of Fiduciary Duty; 4) Breach of Implied Covenant of Good Faith and Fair Dealing; 5)

Promissory Estoppel; 6) Breach of Contract and 7) Breach of Proprietary Information against Defendants Lockheed Martin Corporation ("Lockheed Martin"), Hybrid Enterprises, LLC ("Hybrid Enterprises"), Korn/Ferry International, Inc. ("Korn Ferry") and Robert Binns ("Binns") in the Superior Court of Superior Court of the State of California, County of Los Angeles, West District (Case No. SC128899). That matter is referred to as "the underlying matter."

3.      The first Complaint was filed by Defendant on February 26, 2018.

4.      Following a series of Motions to Dismiss, Plaintiff was allowed to file a Fourth Amended Complaint pleading the above causes of action.

5.      Following that time, counsel for Defendants in the underlying matter filed a Motion for Summary Judgment based on statutes of limitations defenses as to all counts. That motion was filed on February 10, 2022.

6.      Following briefing on the matter, the Court entered an Order granting Defendants' Motion for Summary Judgment based upon various statutes of limitations. That order was entered on June 7, 2022.

7.      That order demonstrates that Defendant Tarpey Wix LLC failed to file Plaintiff's valuable claims on time in the State of California.

8.      As a result of the foregoing, Plaintiff has forever lost its ability to prosecute an action against the Defendants in the underlying matter.

* 5 0 3 4 3 4 9 0 *

## The Parties

9.     Plaintiff Millennium Airship, Inc. ("Plaintiff" or "Millennium") was at all relevant times material to this Complaint a resident of the State of Washington.

10.     Defendant Tarpey Wix LLC ("Defendant") was at all relevant times material to this Complaint a law firm with a principal place of business in Cook County, Illinois.

## Background

11.     For over a decade and pursuant to a series of confidentiality agreements, Plaintiff worked jointly with Lockheed Martin's research and development team in inventing a revolutionary air vehicle for the cargo logistics industry – the "Hybrid Airship"—a blimp-like air freighter having the ability to transport massive cargo to hard-to-reach locations in an efficient and cost-effective means unparalleled by rival modes of freight logistics.

12.     Through a scheme of calculated deceit, Lockheed Martin lured Plaintiff into these confidentiality agreements in order to usurp Plaintiff's innovative vison for this potentially world-changing technology with respect to freight logistics and, perhaps most importantly, to prevent Plaintiff from pursuing the hybrid airship with any of Lockheed Martin's competitors, such as Boeing, which would have the resources necessary to bring the hybrid airship to reality before Lockheed Martin.

\* 5 0 3 4 3 4 9 0 \*

13.     Lockheed Martin strung along Plaintiff, for over ten years into believing that Plaintiff would be part of the hybrid airship project. Lockheed Martin realized that the hybrid airship was a potential game-changer and, even though Lockheed Martin had no intention of including Plaintiff in the ultimate unveiling of the hybrid airship, Lockheed Martin could not risk that Plaintiff brought its ideas, market knowledge and financing resources to a competitor.

14.     So, Lockheed Martin misled Plaintiff for over a decade and methodically used Plaintiff for their resources, access to customer base, development of relevant markets and financing sources.  Then, once Lockheed Martin fully realized the potential of the Hybrid Airship as it evolved closer to becoming a reality because, in large part, of Plaintiff's efforts and that it had advanced the project far enough that a competitor could not beat Lockheed Martin to market, Lockheed Martin then conspired with Korn Ferry and Binns to achieve the final steps of its plan to hijack the Hybrid Airship project for itself.

15.     Lockheed Martin's plan was especially galling because it unequivocally represented to Plaintiff for over a decade that it would never contribute to the financing of the Hybrid Airship project.  These were lies in furtherance of the plan to use Plaintiff for the purposes Lockheed Martin needed in doing all the groundwork needed to get the Hybrid Airship project off the ground and to prevent Plaintiff from pursuing the Hybrid Airship project with a Lockheed Martin competitor.

4

* 5 0 3 4 3 4 9 0 *

## Dealings Between Plaintiff and Defendants

16.    In the early 2000s, Lockheed Martin began to explore the potential application of the Hybrid Airship for commercial purposes.

17.    It was during this time that Lockheed Martin representatives met Mr. Gil Costin at in Washington D.C.  For years Costin had been exploring the development of the hybrid airship through his company, Millennium Airships, Inc.

18.    Millennium was formed by visionary Gil Costin in 1998 for the sole purpose to build, operate, market and sell hybrid airships.  Millennium's and Costin's development of the hybrid airship concept had been in the makings for years, independent of any similar concepts being investigated by Lockheed Martin.

19.    Beginning in 2004, Millennium, through Costin, had numerous dealings and discussions with Lockheed Martin regarding the development of hybrid aircraft for commercial purposes.  These discussions culminated in a series of confidentiality and proprietary information agreements, beginning with the first agreement executed both by Lockheed Martin and Millennium on May 18, 2004.

20.    Up until this point, Costin and Millennium had been discussing the potential of the hybrid airship to a number of other large players in the aerospace/aeronautics industry such as The Boeing Company ("Boeing"), Northrop Grumman Corporation and Worldwide Aeros Corporation. Costin had discussed potential joint venture arrangements

* 5 0 3 4 3 4 9 0 *

with each of these companies – all competitors of Lockheed Martin – to develop the hybrid airship but chose to forego those opportunities based on the representations and feigned commitment of Lockheed Martin to move forward with Millennium on the hybrid airship project.

21.     Millennium and Costin were intricately involved with Lockheed Martin's plan to develop the Hybrid Airship for commercial purposes for the next several years, both from an operational standpoint and connecting Lockheed Martin with potential buyers of the hybrid airship. Indeed, Costin was in frequent contact with Lockheed Martin's Dr. Robert Boyd, Hybrid Aircraft Program Manager/Senior Engineer, and others regarding the design, build and support of the Hybrid Airship, made numerous visits to Lockheed Martin's Skunk Works facility and was provided with Lockheed Martin's documentation of the development of the Hybrid Airship.

22.     From the inception of its dealings with Lockheed Martin, Millennium built up a book of potential customers for the Hybrid Airship in key markets, including Chinese customer Harbin Tian Ye New and High Technology & Industries Ltd., PetroBras, Prince Abdullah in Saudi Arabia and Mitsubishi Heavy Industries, to name a few. All of these customer leads, as well as their respective needs and uses for the hybrid airship, were the result of Millennium's years of work and analysis and were not readily publicly available. Millennium provided all of this confidential customer information to Lockheed Martin based on the

* 5 0 3 4 3 4 9 0 *

protections afforded by the confidential and proprietary agreements and in furtherance of Lockheed's promises to work with Millennium in the development of the Hybrid Airship.

23.     Millennium brought these and other customers to Skunk Works and other off-site locations for meetings with Lockheed Martin on numerous occasions.  Combined, these customers provided Millennium with commitments to purchase Hybrid Airships valued in excess of $1 billion.  Millennium shared all of this information regarding potential customers and sales with Lockheed Martin.

24.     In May 2012, Lockheed Martin and Millennium entered into another agreement designed at protecting everyone's confidential information to be exchanged and respective interests in the project through a Proprietary Information Agreement that provided for the protection against unauthorized use and disclosure of confidential information.  The purpose of the Agreement was so that Lockheed Martin and Millennium could continue to discuss joint business opportunities with each other with regard to the commercial development, marketing and sale of the hybrid airship.  The Agreement remained in effect until May 31, 2015.  At all relevant times, Millennium provided Lockheed Martin with confidential and proprietary information that was protected from disclosure and use by Lockheed Martin without Millennium's consent by the Agreement

7

* 5 0 3 4 3 4 9 0 *

25.    In May 2012, Millennium also entered into a Non-Disclosure Agreement with Aviation Capital Enterprises, Inc., a Lockheed Martin consultant led by Dr. Grant Cool ("Cool"). The purpose of the Agreement was to explore cooperative strategic business relationships or other potential business opportunities with respect to the Hybrid Airship.

26.    While many Lockheed Martin competitors, such as Boeing, continued to solicit Millennium to assist in developing a hybrid airship program, Millennium continued to not pursue those opportunities because of Lockheed Martin's continued representations and promises that it was committed to developing the hybrid airship with Millennium. However, it was the true intention of Lockheed Martin to continue to string Millennium along by entering into these agreements so Millennium would not pursue the hybrid airship project with a Lockheed Martin competitor.

27.    Throughout the remainder of 2012 and into 2013, Millennium continued to work closely, and tirelessly, with Lockheed Martin and its consultants and vendors regarding the commercial development of the Hybrid Airship and continued to develop commitments and projections from customers around the world. Lockheed Martin was also aware that Millennium was fully endorsed by the World Cargo Alliance and, as a result, was tapped into the customer base of approximately 1,103 logistics companies worldwide. Millennium again shared this confidential information with Lockheed Martin based on the agreement

that such crucial business development information would be held in the strictest confidence.

28.     For instance, in May 2012 and in furtherance of Lockheed Martin's and Millennium's joint marketing efforts, the two companies, in conjunction, generated extensive marketing materials and renderings of the Hybrid Airship to present to potential customers and financing sources.  The moniker for the Millennium/Lockheed Martin hybrid airship was "SkyFreighter" – a name which was brought to Lockheed Martin by Millennium which Millennium had been using as its DBA for years and which had been a registered trademark of Millennium since 2000.

29.     Indeed, the renderings created for the Millennium/Lockheed Martin joint venture effort are remarkably similar to the airship renderings recently released by Lockheed Martin to the public shortly after ending its relationship with Millennium, in order to finance the initiative on its own.

30.     In March 2013, Lockheed Martin invited Millennium to present a proposal to Skunk Works about making "hybrid airships a reality in the market" and the "specifics of your vision and plans to accomplish our mutual objectives."   Lockheed Martin requested that Millennium present (1) a leadership team and organizational chart; (2) a business plan, including the specifics of the customer base and customer identities, sales and marketing strategies, financing options including lease and



* 5 0 3 4 3 4 9 0 *

sale, third party financiers, forecasted sales and the timing, production rates and sample sales agreements; (3) a funding plan; and (4) pro forma financials. Lockheed Martin indicated that it expected the evaluation process to be completed in approximately 60 days.

31.    In preparation for the meeting, Lockheed Martin and Millennium provided each other with information on its Hybrid Airship operational costs and its other data regarding the development of the Hybrid Airship.

32.    The meeting with Lockheed Martin was held on March 27, 2013 at the Skunk Works facility in Palmdale, California.  Millennium presented all the information requested by Lockheed Martin, introduced the team members and explained its vision for moving forward, including financing and changing the business name to "Sky Freighter International" ("SFI"), which ultimately was changed to Sky Lift.  The meeting went extremely well and Lockheed Martin stated that it would take some time to review the information presented and make a decision.

33.    On April 2, 2013, Millennium received an email from Lockheed Martin stating that Lockheed Martin was awarding it the exclusive rights to the Hybrid Airship to SFI.

34.    On April 5, 2013, Lockheed Martin sent a Hybrid Aircraft Development Agreement ("Development Agreement") draft to Millennium. The Development Agreement was provided for purposes of documenting the development of the Hybrid Airship.  Over the next few months, Lockheed and SFI negotiated terms of the arrangement.



35. In August 2013, after a lack of progress in finalizing the arrangement, Costin and his partner, Michael Smith ("Smith"), approached Lockheed Martin about forming a new company (Sky Lift) to take over the exclusivity arrangement for the Hybrid Airship with Lockheed Martin. Lockheed Martin agreed and, at Lockheed Martin's direction and insistence, on August 26, 2013, Smith and Costin formed Sky Lift and filed a Certificate of Formation with the Secretary of State of Delaware.

36. On September 19, 2013, Lockheed Martin and Sky Lift entered into a Proprietary Information Agreement ("PIA"). The purpose of the agreement was for Lockheed Martin to discuss proprietary information related to hybrid aircraft design, development, marketing, manufacture and operations and for Sky Lift to discuss proprietary information related to business plans, project plans, financing structures, and all personnel and parties involved with Sky Lift. The term of the PIA was until March 8, 2016.

37. Sky Lift next provided a detailed Strategic Business Plan to Lockheed Martin. Sky Lift stated that it would bring in the very best CEO, CFO and COO to run the company. As part of the plan, Sky Lift contracted with Korn Ferry International (executive recruitment firm) ("Korn Ferry") to find the most qualified CEO to run the company. Korn Ferry, which had a long and profitable relationship with Lockheed Martin at that time, was strongly suggested to Millennium by Lockheed Martin.

* 5 0 3 4 3 4 9 0 *

Because Millennium was unaware of the background plot of Lockheed Martin to ultimately transfer the entire Hybrid Airship development program to a new, Lockheed Martin-anointed and Lockheed Martin-funded entity, Plaintiff unwittingly agreed to engage Korn Ferry, not knowing that Korn Ferry was in on the plan from the get-go.

38.    Based on Lockheed Martin's agreement to proceed with Plaintiff on the project, Plaintiff further engaged Lewis BrisBois (legal), Marsh (insurance), and Vanir Construction Management Inc. (design and construction of manufacturing facility).  The plan's expectations included initial entry into the market through sales of the 20-ton variant of the Hybrid Airship; $250 million in debt financing through an agreement with Structured Growth Capital; and revenue projections of over $5 billion over 5 years from the sale of 108 20-ton Hybrid Airships.

39.    Plaintiff contributed all capital to pay for these initial "start-up" expenditures (approximately $1,000,000) and coordinated the initial debt financing from multiple investors for the project ($250 million), including Structured Growth Capital and Affiliated Financing, LLC.   As alleged above, for the past decade Lockheed Martin had always insisted it would not contribute to the financing of the Hybrid Airship project believing that Plaintiff would never be able to procure such significant financing for what was originally believed to be such an outlandish concept.

40.    Structured Growth Capital ("SGC") agreed to provide funding of $250,000,000 to Sky Lift to acquire the exclusive rights for the worldwide

* 5 0 3 4 3 4 9 0 *

sales and leasing of the Lockheed Hybrid Airship. However, for reasons more fully explained herein, Sky Lift's procurement of a credible financing source caused Lockheed Martin to speed up its plan to transfer the initiative away from Plaintiffs before that financing came in. As Lockheed Martin began to witness that Plaintiff was making the pipe dream of obtaining outside financing for the project become a reality, Lockheed Martin had to step up its efforts in gaining enough information and contacts from Plaintiff in order to abscond away with the project.

41.    As part of its overall plan submitted to Lockheed Martin, and as strongly suggested by Lockheed Martin, Sky Lift entered into an engagement agreement with Korn Ferry to conduct a search for Sky Lift's CEO and COO.

42.    Eventually, Korn Ferry selected Binns as a qualified candidate for the Sky Lift CEO position. On information and belief, and again unbeknownst to Millennium and Sky Lift, Binns was hand selected by Lockheed Martin because it was Lockheed Martin's plan at the time that Binns would only temporarily serve as a "straw man" CEO of Sky Lift until Lockheed Martin's agreement with Sky Lift expired and then Binns would become CEO of the Lockheed Martin-funded new entity (which ultimately became Hybrid Enterprises). Again, placing Binns as a temporary CEO of Sky Lift was also all in furtherance of continuing to lead Plaintiff to believe that their involvement in the project was real

* 5 0 3 4 3 4 9 0 *

when the true intent was to prevent Plaintiff from pursuing opportunities with Lockheed Martin's competitors.

43.     Over the course of two days of meetings on November 6-7, 2013, Lockheed Martin and Sky Lift were able to work through all the remaining issues with the Development Agreement as well as the Definitive Funding Order ("DFO") for Requirements Definition, Preliminary Design, Design, Build, Flight Test, Experimental Certification and Delivery of LZMZ1M-001 (Hybrid Airship) and Build, FAA Type Certification Testing, FAA Type Certification and Delivery of LMZ1M-002, which first had been presented by Lockheed Martin a few months earlier in June 2013.  The parties also agreed on virtually all of the financing structure.  The only outstanding issue regarding the financing was that Lockheed Martin did not want to carry any liability on its own books.  Again, as had been the case since 2004, Lockheed Martin remained adamant that it would not be contributing to the financing of the Hybrid Airship project.

44.     On January 22, 2014, Binns sent a letter to Michael Smith abruptly resigning from what he described, despite his Employment Term Sheet and confidentiality agreement, as his "consulting engagement" with Sky Lift.  He claimed that he was no longer bound by either the Term Sheet or the Nondisclosure Agreement.

45.     Unbeknownst to Plaintiff, apparently immediately after resigning from Sky Lift, Binns, at Lockheed Martin's direction, started Hybrid

* 5 0 3 4 3 4 9 0 *

Enterprises, LLC, a Delaware limited liability company, and assumed the role of CEO.

46.     On information and belief, sometime prior to resigning from Sky Lift, and most likely even before commencing employment, and continuing thereafter, Binns (and subsequently Hybrid Enterprises) began discussions with Lockheed Martin for Hybrid Enterprises to be the worldwide exclusive reseller of Lockheed Martin's Hybrid Airships and for Lockheed Martin to abandon all negotiations with Sky Lift after its (and Millennium's) years of developing the project and contributing over a million dollars to the effort.

47.     Despite secretively initiating discussions with Binns and Hybrid Enterprises, and having no intention of actually moving forward with Sky Lift, Lockheed Martin continued its discussions with Sky Lift throughout 2014 and 2015 in an effort to give the appearance of interest; all-the-while knowing it was going to pursue the project with Binns and Hybrid Enterprises and completely exclude Sky Lift from the project.

48.     Lockheed Martin purposely delayed closing the agreement with Sky Lift and began to indicate, for the first time, that the Hybrid Airship program was in jeopardy, despite Sky Lift providing Lockheed Martin with everything it required to move forward with the development of the Hybrid Airship.  Lockheed Martin's out-of-the-blue insinuations that the Hybrid Airship project was in jeopardy came as a complete surprise to Costin and Smith as the feedback over the last decade of work, from

* 5 0 3 4 3 4 9 0 *

Lockheed Martin as well as potential customers and trade organizations, had been overwhelmingly positive.

49.　On December 15, 2014, Jack W. O'Banion, Vice President, Lockheed Martin Strategy & Customer Requirements, informed Sky Lift that Skunk Works had selected Hybrid Enterprises, now headed by Sky Lift's former CEO Binns, as its exclusive reseller of the Hybrid Aircraft. However, throughout 2015 and reflected in several emails from top Lockheed Martin representatives, Lockheed Martin continued to intentionally mislead Sky Lift that it could still be involved in the project as a "collaborator" with Hybrid Enterprises. Lockheed Martin's intentions were obvious – to continue to harvest valuable information regarding potential customers, markets and uses for the hybrid airship for its own benefit and for the benefit of Hybrid Enterprises and to prevent Plaintiff from approaching a competitor while Lockheed Martin knew it was never going to include its decade-long partner in on the deal.

50.　On June 16, 2015, less than three weeks after the Proprietary Information Agreement with Millennium expired, Lockheed Martin issued a press release announcing that it was now using Hybrid Enterprises as its exclusive, authorized, worldwide reseller of its Hybrid Airships and related aftermarket services. However, realizing that Sky Lift remained a valuable resource, Lockheed Martin continued to invite Sky Lift to "collaborate" on the project moving forward and continued to string

Plaintiff along that the door was not shut on their involvement with Lockheed Martin's hybrid airship program.

51.    It was not until March 30, 2016, that Plaintiff learned, once and for all, that Lockheed Martin had no intention of including Plaintiff on the project when Lockheed Martin, along with Hybrid Enterprises, announced that they had signed a letter of intent with Straightline Aviation, Ltd., based in the United Kingdom, for the purchase of up to twelve Lockheed Martin Hybrid Airships at a value of approximately $480 million.  This deal was a fruit of Plaintiff's labor over the years and the fact that Lockheed Martin failed to inform Plaintiff of this pending deal revealed Lockheed Martin's true plan to usurp more than a decade's worth of work by Millennium for its own benefit.

## The Underlying Lawsuit

52.    On February 26, 2018, Plaintiff filed an action against Defendants Lockheed Martin Corporation, Hybrid Enterprises LLC, Korn/Ferry International Inc., and Robert Binns in the Superior Court of Superior Court of the State of California, County of Los Angeles, West District (Case No. SC128899).

53.    Following a series of Motions to Dismiss, Plaintiff was allowed to file a Fourth Amended Complaint pleading the above causes of action.

54.    The Fourth Amended Complaint contained seven (7) counts: 1) Violation of the California Uniform Trade Secret Act; 2) Breach of Proprietary Information; 3) Breach of Fiduciary Duty; 4) Breach of

17

Implied Covenant of Good Faith and Fair Dealing; 5) Promissory Estoppel; 6) Breach of Contract and 7) Breach of Proprietary Information.

55. Following that time, counsel for Defendants in the underlying matter filed a Motion for Summary Judgment based on statutes of limitations defenses as to all counts. That motion was filed on February 10, 2022.

56. Following briefing on the matter, the Court entered an Order granting Defendants' Motion for Summary Judgment based upon various statutes of limitations. That order was entered on June 7, 2022.

57. In disposing of Plaintiff's trade secret claim, the court held that the undisputed facts demonstrate that by January 3, 2015, at the very latest, Plaintiff knew of its claims against Lockheed Martin, suspected misappropriation of its trade secrets including the customer lists by Binns, knew of the risk of damages, knew of Binns's involvement with Hybrid Enterprises, knew that Hybrid Enterprises had an exclusive relationship with Lockheed Martin instead of Plaintiff, and explicitly contemplated litigation based upon a belief that Binns had shared their confidential information with Lockheed Martin. In reaching their decision on the trade secret claim, the court held that Plaintiff was required to file any such claim within three years of January 3, 2015. Plaintiff did not file the suit until February 26, 2018.

* 5 0 3 4 3 4 9 0 *

58.     As to the breach of contract claims, the court held that Plaintiff's claims were similarly barred by the applicable four (4) year statute of limitations.

59.     Specifically, the court found that Plaintiff knew of or at least suspected the breach of contract claims against Defendants in the underlying matter by January 2014. As a result, Plaintiff's filing of the underlying complaint in February of 2018 was time-barred.

60.     Finally, the California court disposed of Plaintiff's Promissory Estoppel claims based upon a two year statute of limitations.

61.     There, the court held that Plaintiff was on notice in 2015 of the underlying Defendants' breach of their promise to enter into a partnership for the manufacture of hybrid airships.

62.     The June 7, 2022 Order demonstrates that Defendant Tarpey Wix LLC failed to file Plaintiff's valuable claims on time in the State of California.

63.     As a result of the foregoing, Plaintiff has forever lost its ability to prosecute an action against the Defendants in the underlying matter.

### Count I – Legal Malpractice

64.     Plaintiff re-alleges and incorporates by reference Paragraphs 1-63 as and for Paragraph 64 of Count I as though fully set forth herein.

65.     At all times relevant to the instant Complaint, Defendant had an attorney client relationship with the Plaintiff.

66.     As Plaintiff's attorney, Defendant was required to act within the standard of care, including a duty to act as a reasonably competent attorney would have acted under the circumstances.

67.     Defendant breached the standard of care in his representation of the Plaintiff by one or more of the following respects:

    a) Failing to timely file Plaintiff's valuable claims against the Defendants in the underlying matter, ultimately resulting in Plaintiff's claims being dismissed after summary judgment upon statutes of limitations defenses;

    b) Failing to act with reasonable diligence and promptness in representing a client by conduct in violation of Rule 1.3 of the Illinois Rules of Professional Conduct;

    c) Engaging in conduct that is prejudicial to the administration of justice in violation of Rule 8.4 of the Rules of Professional Conduct; and

    d) Otherwise acting in a careless and negligent manner.

68.     But for the negligent acts and breaches of the standard of care, Plaintiff would have successfully prosecuted its claims for against the Defendants in the underlying matter.

69.     As a direct and proximate result of the Defendant's negligence and breaches of the standard of care, Plaintiff incurred damages including, but not limited to the loss of its ability to prosecute an action against the Defendants in the underlying matter.

70.     Also, as a direct and proximate result of the Defendant's negligence and breaches of the standard of care, the legal services of Defendant were rendered valueless, requiring the disgorgement of any and all legal fees previously paid and the withdrawal of any and all future fee requests from Defendant.

WHEREFORE, for all the foregoing reasons, Plaintiff, Millennium Airship, Inc., requests the Court to enter judgment in its favor and against Defendant, Tarpey Wix LLC, for an amount in excess of $50,000.00 to be proven at trial, and for such other and further relief as the Court shall deem just and proper.

Millennium Airship, Inc. (Plaintiff),

By: Jefferey Ogden Katz
Jefferey Ogden Katz (#6283209)
The Katz Law Firm, P.C. (#101042)
161 N Clark St #1600
Chicago, Illinois 60601
Telephone: 312-300-3727
jkatz@thekatzlaw.com

10/12/2023 12:22 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023L010391
Calendar, Y

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

Millennium Airship, Inc.

        Plaintiff,

    v.

Tarpey Wix LLC,

        Defendant.

No.  2023L010391

**JURY TRIAL DEMANDED**

### Affidavit Pursuant to Supreme Court Rule 222(B)

Jefferey Ogden Katz, being first duly sworn on oath, deposes and states as follows:

    1. I am one of the attorneys for Plaintiff, Millennium Airship, Inc., in this cause.

    2. The total amount of money damages sought in this cause exceeds $50,000.

        Further, affiant sayeth naught.

By: Jefferey Ogden Katz
Jefferey Ogden Katz (#6283209)
The Katz Law Firm, P.C. (#101042)
161 N Clark St #1600
Chicago, Illinois 60601
Telephone: 312-300-3727
jkatz@thekatzlaw.com

# EXHIBIT

# B

# COOK COUNTY SHERIFF

# DOCUMENT

11/24/23, 12:02 PM
Case: 1:23-cv-16218 Document #: 1 Filed: 11/24/23 Page 31 of 31 PageID #:31
Search Results – Cook County Sheriff

(/) (/)

Select Language ▼

# Search Results

By using this search tool, you acknowledge that you understand that it is solely your responsibility to verify any information you may obtain herein before relying on said information for any type of legal action.

Case Number
2023L010391

Sheriff Number
50343490
Street
W Wacker Dr, Chicago, IL 60606
Status
SERVED

Service Date
10/25/2023 11:00 AM
Service Type
Service on a Corporation/Company/Business/Partnership

Search Again (/CivilProcess)

# User Instruction Guides

Click on the following links to view instructions that will guide you throughout the case filing process:

Introduction (/Content/PDF/ManualIntroductionPDF.pdf)

Log in and Select Language (/Content/PDF/LanguageAndLogin.pdf)

Creating an Account (/Content/PDF/AccountCreation.pdf)

Access the New E-File Case Page (/Content/PDF/AccessNewEfileCasePage.pdf)

Create New E-File (/Content/PDF/CreateNewEfileCase.pdf)

Add a Service (/Content/PDF/AddAService.pdf)

Uploading Documents to Service Requests (/Content/PDF/AddingDocumentsToServices.pdf)

Summary (/Content/PDF/Summary.pdf)

Payment (/Content/PDF/PayViaLexisNexis.pdf)

Receipts (/Content/PDF/Receipts.pdf)